UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KAREN L. PARKS, | |
| Petitioner, | Case No. 1:09-CV-510-CWD |
| v. | **MEMORANDUM DECISION AND ORDER** |
| MICHAEL J. ASTRUE, Commissioner of Social Security Administration, | |
| Respondent. | |

## INTRODUCTION

Currently pending before the Court for its consideration is Petitioner Karen L.

Park's ("Petitioner") Petition for Review (Dkt. 1) of the Respondent's denial of social

security benefits, filed on October 7, 2009. The Court has reviewed the Petition for

Review and the Answer, the parties' memoranda, and the administrative record ("AR"),

and for the reasons that follow, will remand to the Commissioner with an order to grant

benefits.

## PROCEDURAL AND FACTUAL HISTORY

Petitioner filed an application for Disability Insurance Benefits and Supplemental

Security Income on August 11, 2006, alleging a disability onset date of September 15, 2005, due to fibromyalgia, sleep disorder, migraines, depression, degenerative disc disease, and irritable bowel syndrome. Petitioner's application was denied initially and on reconsideration. A hearing was held on January 6, 2009, before Administrative Law Judge ("ALJ") Lloyd Hartford, who heard testimony from Petitioner, medical expert Thomas Atkin, M.D., and vocational expert Anne Aastum. ALJ Hartford issued a decision finding Petitioner not disabled on April 1, 2009, and Petitioner timely requested review by the Appeals Council, which denied her request for review on August 24, 2009.

Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g). At the time of the hearing, Petitioner was 56 years of age. Petitioner completed high school. Her prior work experience includes a 26 year work history for a grocery chain in various positions, including cashier, bookkeeper, and department manager.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantially gainful activity. The ALJ found Petitioner had not engaged in substantial gainful activity since her alleged onset date. At step two, it must be determined whether the claimant suffers from a severe impairment. The ALJ found Petitioner's fibromyalgia, cervical degenerative disc disease, obesity, bilateral hip bursitis, adjustment disorder with depressed mood, pain disorder,

and general medical conditions severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found that Petitioner's impairments, specifically her fibromyalgia and degenerative disc disease, did not meet or equal the criteria for the listed impairments. If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity ("RFC") and determine at step four whether the claimant has demonstrated an inability to perform past relevant work.

The ALJ found Petitioner to be not credible concerning the severity and limiting effects of her pain, and therefore determined she was able to perform her past relevant work as a cashier, department manager, or supervisor.

As a result, the ALJ did not consider step five, which would have shifted the burden to the Commissioner to demonstrate that the claimant retains the capacity to make an adjustment to other work that exists in significant levels in the national economy, after considering the claimant's residual functional capacity, age, education and work experience.

**STANDARD OF REVIEW**

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see*

*also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Fitch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if

there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

When reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

## DISCUSSION

Petitioner believes the ALJ erred at step four by finding Petitioner not credible and improperly rejecting her testimony concerning the intensity, persistence and limiting effects of her pain and resulting fatigue. Because the ALJ rejected Petitioner's subjective complaints of pain, Petitioner contends the ALJ improperly rejected the opinions of Petitioner's treating physicians which, to a large extent, relied upon Petitioner's subjective complaints of pain. And finally, Petitioner contends the ALJ failed to properly consider the testimony of three lay witnesses because their testimony was based also upon Petitioner's subjective complaints of pain. Respondent contends that there was substantial

evidence in the record to support the ALJ's credibility finding and, therefore, to support his rejection of the opinions of the treating physicians and lay witnesses.

Because the ALJ based his rejection of the physician testimony and lay witness statements primarily upon his finding that they relied upon testimony from the Petitioner that was not credible, the Court will examine the ALJ's credibility finding first.

**1. Background**

Petitioner was first diagnosed with fibromyalgia after suffering injuries in two motor vehicle accidents that occurred in 1993 and 1994. (AR 40.) Dr. Nolan, Petitioner's treating rheumatologist, began treating her for musculoskeletal pain and headaches that began after the first auto accident on November 5, 1993. (AR 352–57.) At that time, Petitioner was working as a department manager for a large grocery chain in California. (AR 49.) On August 4, 1996, Dr. Nolan provided a status update indicating that Petitioner reported her pain level fluctuated between 2 and 6 throughout the day, that she was somewhat restricted in her daily physical activities, but could still perform her normal activities as Assistant Manager. (AR 352–57.) Dr. Nolan indicated also that Petitioner's symptoms had not improved since the motor vehicle accident despite multiple trigger point injections, and during office visits, she was tearful, depressed, and fatigued due to her symptoms. (AR 352–57.) On May 5, 1999, Dr. Nolan provided a letter for Petitioner to give to her employer requesting accommodations to not work the late night shift, as her pain and stiffness were worse at night. (AR 353.) On September 18, 2002, Dr. Nolan provided a third letter to Petitioner advising her to limit her work hours to 34 hours per

week or less due to her chronic musculoskeletal pain and fatigue. (AR 351.)

Treatment records covering the period from June 14, 2005 to July 21, 2005, from Rancho Family Medical Group, confirmed upon physical examination that Petitioner experienced pain "in all aspects of her body" when the physician examined her. (AR 224.) During that period, Petitioner complained of severe headache, vomiting, and diarrhea. (AR 224.) Her symptoms were being managed with the use of Vicodin, Effexor, Skelaxin, and Toradol injections, as well as morphine as necessary. (AR 225.)

In 2000, Petitioner requested a demotion from her position as department manager to cashier, a lighter duty position, due to her condition. (AR 51–52, 140.) Between 2002 and 2005, Petitioner reported that she continued working, but with a reduced schedule. Petitioner's manager apparently accommodated her condition, permitted her to use all her available sick and vacation time, and allowed her to work lighter duty positions. (AR 48–67.) However, Petitioner testified her pain worsened to the point she was unable to work, and she voluntarily left her employment, taking early retirement, on or about September 15, 2005. (AR 48.) Because she could not support herself with her retirement earnings in the amount of $1,040 per month, Petitioner moved to Idaho in 2006 to live with her sister. (AR 54.) Thereafter, Petitioner married and she now lives with her husband. (AR 57.)

Upon her move to Idaho, Petitioner sought medical care from Dr. Pogue, a family medicine specialist, and Dr. Quattrone, a pain management specialist. On February 7, 2006, Dr. Pogue referred Petitioner to Dr. O'Brien, a neurologist. Upon examination, Dr.

O'Brien noted the "hallmarks of fibromyalgia, that is wince signs that are demonstrated in multiple areas of the shoulder girdle." (AR 227.) Dr. O'Brien "picked up at least 8 such wince signs just by a cursory examination." (AR 227; 228.) At that visit, Petitioner reported her body hurt, and that her pain was at level 9, defined as "unable to do any activities because of pain." (AR 229–30.)

On October 12, 2006, disability services psychologist Dr. Seidenfeld examined Petitioner. He reported that Petitioner's husband drove her to the appointment, she walked slowly, and she showed "mild" pain behaviors during the one hour exam. (AR 232.) During the interview, Petitioner reported she was unable to get out of bed "most days" because of her pain and the side effects from medication, often staying in bed until late afternoon. (AR 233.) Petitioner described her pain as an "8 or 9." (AR 236.) Dr. Seidenfeld noted Petitioner's long history of chronic pain, and believed "she was truthful and the information she provided reliable." (AR 233.) Dr. Seidenfeld confirmed the diagnosis of "pain disorder" and fibromyalgia, as well as depression as one effect of the pain. (AR 240.) From a cognitive standpoint, Dr. Seidenfeld opined that Petitioner would be capable of doing repetitive, simple, routine tasks "fairly well." (AR 239.)

On November 3, 2006, non-examining psychologist Dr. Sanford completed a mental residual functional capacity assessment, noting that Petitioner had moderate limitations in her ability to complete a normal workday and workweek without interruption. (AR 263.) According to Dr. Sanford, taking into consideration Petitioner's pain and fatigue, in his opinion there was "no objective evidence that [Petitioner was] not

capable of light work activity." (AR 243.)

Dr. Pogue's treatment notes between November 10, 2005 through March 6, 2008, indicated that, throughout this period, Petitioner sought treatment for cluster headaches, generalized muscle pain, muscle twitches, loss of sleep, irritable bowel, nausea, fatigue, and other symptoms. Dr. Pogue had prescribed a duragesic pain patch to control Petitioner's pain, as well as several other medications including anti-depressants and Imitrex for her headaches. (AR 295.) On September 28, 2006, Petitioner reported that Lyrica 75 was working better, and that she was not as sleepy. (AR 301.) On June 11, 2007, Dr. Pogue provided a letter indicating his diagnosis of fibromyalgia with chronic pain, cluster migraines, depression, GERD, hypertension, insomnia and arthritis. (AR 281.) He provide a list of her medications, and rendered his opinion that the Petitioner was "permanently disabled and at no time will return to work." On June 21, 2007, Dr. Pogue completed a physical RFC assessment. Although the RFC assessment indicated that Petitioner could stand or walk with normal breaks for a total of 2 hours and sit with normal breaks for a total of 6 hours, Dr. Pogue indicated she had physical limitations in her upper extremities and again noted his opinion that Petitioner was totally disabled based upon the diagnosis of chronic pain and fibromyalgia. (AR 279.)

Dr. Quattrone began providing care on or about March 20, 2008. (AR 358.) On both September 2, 2008, and December 2, 2008, Dr. Quattrone noted Petitioner reported her pain as a 7, that she observed a flat affect, and that Petitioner was tearful and appeared fatigued. Dr. Quattrone also determined that Petitioner's pain had increased since she

began physical therapy, and she decided to decrease her duragesic patch and recommended no further physical therapy. (AR 347, 359.) In a treatment note dated October 1, 2008, Dr. Quattrone observed Petitioner to be fatigued, with a flat affect, and documented 18/18 tender points consistent with fibromyalgia. (AR 346.) In addition, Petitioner reported her headaches were worse, and her medications were causing her to sleep too much. (AR 346.) On November 4, 2008, Dr. Quattrone noted pain behaviors upon physical exam, a flat affect, and normal strength. (AR 345.) In a letter dated January 2, 2009, Dr. Quattrone provided her opinion that Petitioner was not capable of full-time work on a consistent basis, even at a light sedentary level. (AR 358.)

Following Dr. Pogue's death, Dr. Wooll began providing primary care to Petitioner in June of 2008. (AR 343.) Dr. Wooll prescribed physical therapy for Petitioner's pain in her hips. By October 7, 2008, however, Petitioner reported to Dr. Wooll that her medications, specifically Amitriptyline, was making her sleep all of the time, her headaches were not under control, and physical therapy exacerbated her pain. She also reported restless leg syndrome, which was observed by her husband who had accompanied Petitioner to the exam that day. (AR 339.)

Petitioner attended physical therapy between June 10, 2008 and July 15, 2008, for pain in her hips. (AR 335). At her first visit on June 10, 2008, Petitioner reported her pain at best level 7, at worst a 10, and for the majority of time, a level 8. (AR 336.) She also reported that she was only out of bed for six hours or less each day, that she experienced pain, and trouble walking. The physical therapist observed Petitioner had decreased

weightbearing on her left lower extremity, and decreased functional strength in her lower extremities. (AR 337.) By August 5, 2008, Petitioner had stopped physical therapy, reporting to Dr. Quattrone that she had not been to physical therapy due to pain. (AR 326.) At that visit, Dr. Quattrone observed Petitioner to be fatigued with a flat affect, noted tenderness in her hip bursas, and gave bursa injections in both hips to relieve Petitioner's pain. (AR 326.)

At the hearing, the ALJ asked Petitioner about her daily activities. Petitioner testified that most of her day was spent managing and taking care of her pain rather than doing anything productive. (AR 68-69.) She testified that her pain was constant, remaining at a level 8–10, and that it had been that way for at least three years. (AR 47.) Due to her pain and fibromyalgia, Petitioner had been on various medications for 15 years, and while the medications change in terms of what is prescribed, she had always been prescribed medications for pain, depression, and other symptoms. (AR 46.) Petitioner described the side effects from her medications, such as irritable bowel, diarrhea, fatigue, flare ups, and nausea. (AR 43.) As of December 15, 2008, Petitioner was taking 14 prescription medications, including a Fentanyl patch. (AR 181.) She no longer drove and had ceased all outside activities other than her medical appointments. (AR 58.) Petitioner's testimony at the hearing concerning her activities was consistent with the report she  provided to disability services on February 4, 2007. (AR 155–166.)

Three lay witnesses provided letters confirming Petitioner's lack of activity. In a letter dated December 22, 2008, Petitioner's husband indicated his wife experienced

chronic fatigue and pain, which when severe, caused her to be in bed for days.

Petitioner's parents indicated that prior to their daughter's injury and diagnosis of

fibromyalgia, she worked full time and raised her family, but the fibromyalgia resulted in

pain, fatigue, headaches, and muscle and joint pain. (AR 209.) Petitioner's parents

reported that they assist their daughter with daily chores, and had moved next door to be

of more help. (AR 209.) Finally, Petitioner's pastor provided a letter indicating that he

had known Petitioner through church for about one year, and had visited the home. (AR

210.) On those home visits, he reported that Petitioner often could not visit with him, and

that he had observed her discomfort. (AR 210.)

The medical expert, Dr. Atkins, was of the opinion that there was no significant

somatic component to Petitioner's pain. (AR 35–36.) Dr. Atkins believed that pain

impacted Petitioner's functioning, but from a "purely psychological component,"

Petitioner was within normal limits. (AR 35–36.) The vocational expert, Ms. Aastum,

testified that if Petitioner's subjective reports of pain were credible, all work, including

her past relevant work, would be precluded. (AR 72–73.) The ALJ asked the vocational

expert to consider Dr. Pogue's physical RFC form. According to the vocational expert, if

Dr. Pogue's "check the box" form were considered without considering Dr. Pogue's

ultimate conclusion of disability, Petitioner could perform light exertional work,

including her past work as a cashier, because those positions did not require standing or

walking more than two hours at a time. (AR 74.)

In his written determination, the ALJ rejected Petitioner's subjective complaints

regarding pain and fatigue because the description of her pain "has been so extreme as to seem implausible." The ALJ did not credit Petitioner's testimony about the side effects of her medications, and stated that "the alleged side effects have not been so significant that she has stopped taking her pain and other medications. Her claim that her medications don't help her pain seems incredible since she has been taking them for years and continues taking them." (AR 18.) In addition, the ALJ found the lack of any treatment notes documenting Petitioner's lack of activity significant to discredit Petitioner's testimony. The ALJ also did not credit Petitioner's symptom testimony because he "presumed" she had no "motivation" to work because of her retirement income and her husband's income. (AR 19.) Finally, the ALJ relied upon Dr. Seidenfeld's consultative exam, during which Petitioner was not observed to be inhibited by her pain, and her allegations of memory loss, disabling pain and fatigue, and reduced functioning were not supported upon examination. (AR 18.)

The ALJ did not give the opinions of Dr. Quattrone or Dr. Pogue controlling weight because these physicians relied upon Petitioner's subjective assertions and self-reports, which the ALJ discredited. (AR 20.) The ALJ noted that Dr. Pogue's opinion rested on an assessment of fibromyalgia which was outside his area of expertise, and there was no reference to "specific medical findings" supporting either physician's diagnosis of fibromyalgia in the record. (AR 20.) Therefore, the ALJ relied upon the assessment of the state agency medical consultant, who had determined that Petitioner was capable of light work activity. (AR 20.)

For the same reasons, the ALJ rejected the lay witness testimony because the third party statements relied upon the Petitioner's subjective complaints, which the ALJ found not credible. The ALJ found that no doctor had instructed Petitioner to lie down and rest excessively due to fibromyalgia; no physician had noted weakness; and, in one examination in May of 2008, Petitioner reportedly had normal usage of her joints and her pain was "under control" at that time. (AR 21.)

Finally, the ALJ noted that Petitioner continued to work until 2005, during which time she allegedly suffered from fibromyalgia. (AR 19.) He stated in his written determination that Petitioner's symptoms and side effects had been present at the same level of severity prior to 2005, but did not prevent her from working. (AR 19.) Therefore, the ALJ's RFC assessment found Petitioner capable of light work, and only mildly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (AR 16–17.)

## 2. Credibility Determination

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ's findings must be supported by specific, cogent reasons. *Reddick*, 157 F.3d at 722. If a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints of pain based solely on lack of medical evidence. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). *See also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (holding that

an ALJ may not discredit a claimant's subjective testimony on the basis that there is no objective medical evidence that supports the testimony).  Unless there is affirmative evidence showing that the claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting pain testimony.  *Burch*, 400 F.3d at 680.  General findings are insufficient; the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.  *Reddick*, 157 F.3d at 722.

The reasons an ALJ gives for rejecting a claimant's testimony must be supported by substantial evidence in the record.  *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1296 (9th Cir. 1999). If there is substantial evidence in the record to support the ALJ's credibility finding, the Court will not engage in second-guessing.  *Thomas v. Barnhart*, 278 F.3d 957, 959 (9th Cir. 2002). When the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

In evaluating credibility, the ALJ may engage in ordinary techniques of credibility evaluation, including considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony, or between claimant's testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which claimant complains.  *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  Also, the ALJ may consider the location, duration and frequency of symptoms; factors that precipitate and aggravate those symptoms; the amount and side effects of medications; and treatment

measures taken by the claimant to alleviate those symptoms.  *See* Soc. Sec. Ruling 96-7p.

It is well documented in the record that, since 1993, Petitioner suffered from fibromyalgia, "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004.) Symptoms, all of which Petitioner reportedly experienced, include chronic pain, multiple tender points, fatigue, stiffness, and sleep disturbances, all of which can "exacerbate the cycle of pain and fatigue associated with this disease." *Benecke*, 379 F.3d at 590. The disease is diagnosed entirely on the basis of a patient's reports of pain, and there are no laboratory tests to confirm the diagnosis. *Benecke*, 379 F.3d at 590. However, to be diagnosed with fibromyalgia, the patient must experience pain in at least 11 of 18 specific tender points located in areas of the body where muscles and tendons join together. *See* National Fibromyalgia Association.[1] Upon cursory examination Dr. O'Brian noted Petitioner had "at least" eight wince points, while Dr. Quattrone detected 18 out of 18 tender points upon physical examination.

The ALJ erred in discounting Petitioner's credibility and the evaluations of her treating physicians. The record provides little support for the ALJ's credibility finding. In discrediting Petitioner's testimony about the severity of her symptoms, the ALJ relied largely upon his own unsupported assumptions that Petitioner's description of her daily activities, or lack thereof,  were so extreme so as to be simply implausible, and that

---

[1] http://www.fmaware.org/site/PageServerda3b.html?pagename=fibromyalgia_diagnosed (last visited Mar. 7, 2011, and attached to this decision as Attachment 1.)

because Petitioner was earning money from early retirement and being supported by her husband, she was "not motivation [sic] to work." The ALJ also assumed that Petitioner's allegations concerning the ineffectiveness of her medications "seems incredible," because if it were really true that the medications caused such horrific side effects Petitioner should have simply "stopped taking" them. The fact she did not stop taking the medications was, according to the ALJ, cause for not crediting Petitioner's testimony.

The Court finds that the assumptions made by the ALJ do not constitute substantial evidence or clear and convincing reasons to discredit Petitioner's testimony, considering Petitioner consistently sought treatment for her condition; no physician ever recommended she stop taking her medication; and no physician questioned the severity of Petitioner's pain or the truthfulness of her statements. Even Dr. Seidenfeld, the agency psychologist, believed Petitioner was truthful when recounting her symptom testimony. The activities Petitioner described on her disability forms and at the hearing, as well as those described by the three lay witness statements, were fully consistent with fibromyalgia. *See Reddick v. Chatter*, 157 F.3d 715, 722 (9th Cir. 1998). Petitioner consistently described her pain level to Drs. Pogue, O'Brien, and Quattrone as no less than 7, and often at level 8 or 9. Level 9 was defined on Dr. O'Brien's form as "unable to do any activities because of pain." Petitioner's level of activity was consistent with her claimed limitations, yet the ALJ simply assumed that such allegations were not credible without any support in the record. Only if the level of activity was inconsistent with Petitioner's claimed limitations would such activities have any bearing on Petitioner's

credibility. *Reddick*, 157 F.3d at 722. In this case, however, Petitioner's activities were <u>consistent</u> with her claimed limitations.

The ALJ also determined that Petitioner was able to work from 1993 to 2005 with her fibromyalgia, suffering then from all of the same symptoms and side effects. However, the ALJ ignored the evidence in the record from Dr. Nolan, Petitioner's treating rheumatologist at that time, that her pain was reportedly between a level 2 and 6 during that time period, but reported between 8 and 9 to Dr. Pogue and Dr. Quattrone throughout 2006, 2007 and 2008. Her pain had therefore increased since 2005. In addition, the ALJ ignored the September 2002 letter from Dr. Nolan advising Petitioner to decrease her work hours, and Petitioner's testimony that her employer accommodated her illness by various means.

Finally, the ALJ relied upon the clinical observations of the consultative psychologist, Dr. Seidenfeld. Dr. Seidenfeld conducted a one hour psychological interview during which Petitioner exhibited mild pain behaviors and her cognitive functioning was within normal limits. Based upon the examination, the ALJ concluded that her presentation and functioning during the interview "seemed inconsistent" with Petitioner's claim of functional loss due to pain, fatigue and medication side effects. (AR 18.) However, Dr. Seidenfeld considered Petitioner truthful and the information reliable with respect to Petitioner's description of her pain and history. When Dr. Seidenfeld's observations are considered in contrast to the considerable evidence in the record documenting Petitioner's symptoms and the observations by her treating physicians over

a span of years, as well as the lack of any affirmative evidence of malingering, reliance upon Dr. Seidenfeld's observations was inadequate and unsatisfactory for discounting Petitioner's credibility. The court finds, therefore, that the ALJ's findings were unsupported by substantial evidence based on the record as a whole.

## 3. Physician testimony

Case law from the United States Court of Appeals for the Ninth Circuit distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chatter*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight is accorded to the opinion of a treating source than to nontreating physicians. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). If the treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991). If the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject the treating physician's opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983). In turn, an examining physician's opinion is entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).

An ALJ is not required to accept an opinion of a treating physician if it is

conclusory and not supported by clinical findings. *Matney ex rel. Matney v. Sullivan*, 981
F.2d 1016, 1019 (9th Cir. 1992). Additionally, an ALJ is not bound to a physician's
opinion of a petitioner's physical condition or the ultimate issue of disability. *Magallanes
v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the record as a whole does not support
the physician's opinion, the ALJ may reject that opinion. *Batson v. Comm'r of Soc. Sec.
Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Items in the record that may not support
the physician's opinion include clinical findings from examinations, conflicting medical
opinions, conflicting physician's treatment notes, and the claimant's daily activities. *Id.*;
*Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871
(9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999). An
ALJ also may reject a treating physician's opinion if it is based "to a large extent" on a
claimant's self -reports that have been property discounted as not credible. *Tommasetti
v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

In the instant case, the ALJ rejected the opinions of Dr. Pogue and Dr. Quattrone,
Petitioner's treating physicians, because they relied upon the Petitioner's subjective
assertions and self-reported history. Instead, the ALJ relied upon the state agency medical
consultants' opinions. For the same reason expressed by the court in *Reddick*, this Court
finds here the ALJ's rejection of the opinions of Drs. Pogue and Quattrone on the premise
that they were based on the subjective complaints of the Petitioner ill-suited to this
fibromyalgia case. *Reddick*, 157 F.3d at 725 (rejecting ALJ's conclusion for discrediting
physician testimony because it was based upon self-reports of the claimant, who had

chronic fatigue syndrome). Petitioner manifested all of the symptoms of fibromyalgia, including objective evidence of pain at 18 of 18 tender points.

Five physicians—Drs. Nolan, O'Brien, Pogue, Quattrone, and Wooll—as well as Petitioner's physical therapist, all of whom observed Petitioner over long periods of time, diagnosed and treated Petitioner for fibromyalgia and the resultant fatigue and side effects of her prescribed medications. Two of Petitioner's treating physicians believed she was disabled and could not work, while Dr. Nolan in 2002 opined that Petitioner should reduce her schedule. As for the testifying medical expert, his testimony at the hearing was limited to an opinion regarding Petitioner's psychological functioning, with no reference to her physical limitations. The record therefore provides no basis for the ALJ's finding that the consulting examiners' opinions were "not rebutted" by the evidence and testimony in the record, and rejection of Petitioner's treating physicians' opinions was improper.

## 4. Lay witness testimony

An ALJ must consider evidence from sources other than the claimant, including family members and friends, to show the severity of a claimant's impairment. 20 C.F.R. § 404.1513(d)(4); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). Lay testimony regarding a claimant's symptoms constitutes competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)

(internal citations omitted)); *Regennitter v.Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294 (9th Cir. 1999). Such reasons include conflicting medical evidence, prior inconsistent statements, or a claimant's daily activities. *Lewis v. Apfel*, 236 F.3d 503, 511–12 (9th Cir. 2001).

In rejecting lay testimony, "the ALJ need not cite the specific record as long as 'arguably germane reasons' for dismissing the testimony are noted, even though the ALJ does 'not clearly link his determination to those reasons,' and substantial evidence supports the ALJ's decision." *Holzberg v. Astrue*, No. C09-5029BHS, 2010 WL 128391 at *11 (W.D. Wash. Jan. 11, 2010) (citing *Lewis*, 236 F.3d at 512). However, "where the ALJ's error lies in failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F3d 1050, 1056 (9th Cir. 2006).

In this case, the ALJ's determination rejected the third party statements because they relied upon the Petitioner's subjective complaints, and Petitioner reported to Dr. Quattrone in April 2008 that her fibromyalgia was "under control." (AR 21.) The ALJ erred in his analysis, because his reasons for doubting the three lay witness statements were not germane to them. The one instance in Petitioner's medical history where she reportedly was doing well also does not counter the weight of the evidence demonstrating otherwise. It was therefore error for the ALJ to disregard the lay witness statements.

## CONCLUSION

For the reasons described herein, the Court holds that the ALJ's decision that Petitioner is capable of performing her past relevant work as a cashier is not supported by substantial evidence. After years of ongoing treatment, various drug regimens including narcotic pain relievers, and referral to specialists, Petitioner's treating physicians found her to be disabled. The ALJ's finding that Petitioner was not disabled was premised upon his own disbelief that Petitioner's activities could be so severely limited and were explained instead by lack of motivation, and upon his reliance on reports by consultative examiners hired in connection with Petitioner's disability claim. Dr. Seidenfeld's and Dr. Atkin's opinions were limited to psychological testing and functioning, and Petitioner's mental capacity to work, but did not consider Petitioner's fatigue, pain fluctuations, or the effects of her medication regimen upon her ability to work or sustain a full-time schedule. None of the consultative examining physicians assessed Petitioner's ability to perform work on a sustained basis in light of the fatigue, side effects from medication, and pain caused by fibromyalgia over time. The Court concludes, therefore, that the evidence in the record does not support the discounting of the treating physicians' conclusions that Petitioner is disabled from future employment.

The last remaining issue to resolve is whether to remand for further proceedings or for an award of benefits. Petitioner argues that a reversal and remand with an order for immediate payment of benefits is appropriate in this case. The Court has discretion to remand a case either for additional evidence and findings, or for an award of benefits.

*Vasquez v.* Astrue, 572 F.3d 586, 600 (9th Cir. 2009); *Reddick,* 157 F.3d 715, 728. An award of benefits may be directed if "the record has been fully developed and further administrative proceedings would serve no useful purpose." *Reddick,* 157 F.3d 715, 728. Circumstances arise to award benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Vasquez*, 572 F.3d at 600. In addition, the Court should not remand for further proceedings where, taking the Petitioner's testimony as true, the ALJ would be required to award benefits. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007).

In this case, the ALJ posed to the vocational expert a hypothetical incorporating the Petitioner's statements. Although the ALJ later decided that the limitations were not credible, the vocational expert's testimony established that, taking Petitioner's testimony as true, Petitioner was disabled and all work would be precluded. (AR 73.) The record in this case is fully developed with respect to Petitioner's subjective complaints of pain, the increase of pain over time, and its debilitating effects, including the effects of her medications. Petitioner's treating physicians considered Petitioner to be disabled. Therefore, further proceedings are unnecessary, and the Court will reverse the Commissioner's determination and remand for a calculation and award of benefits.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Petition for Review (Dkt. 1) is **GRANTED** and the decision of

the Commissioner is **REVERSED**.

2)      This action shall be **REMANDED** to the Commissioner for further

proceedings consistent with this opinion.

3)      This Remand shall be considered a "sentence four remand," consistent with

42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir.

2002).

DATED: March 7, 2011

Honorable Candy W. Dale
Chief United States Magistrate Judge